## Billy DODSON *v.* STATE of Arkansas

CA CR 03-1332 199 S.W.3d 115

Court of Appeals of Arkansas
Opinion delivered December 1, 2004

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

TERRY CRABTREE, Judge. Billy Dodson was found guilty in a jury trial of manufacturing methamphetamine, possession of drug paraphernalia with intent to manufacture methamphetamine, and possession of methamphetamine with intent to deliver. As a result of these convictions, he was sentenced to ten years in prison. Appellant contends on appeal that his convictions are not supported by substantial evidence and that the trial court erred in denying his motion to suppress. We hold that the evidence is sufficient to sustain his convictions, but we reverse the denial of the motion to suppress.

 The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Dye v. State,* 70 Ark. App. 329, 17 S.W.3d 505 (2000). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Walley v. State,* 353 Ark. 586, 112 S.W.3d 349 (2003). In determining whether a finding of guilt is supported by substantial evidence, we review the evidence, including any that may have been erroneously admitted, in the light most favorable to the verdict. *Dye v. State, supra.*

The evidence presented at trial, when viewed in the appropriate light, reflects that on June 20, 2002, Officer Jack Fitzhugh of the Cabot Police Department was dispatched to appellant's home after appellant reported setting a fire in the front yard. Officer Fitzhugh extinguished the fire and observed that the burn pile contained items used to manufacture methamphetamine, such as three one-gallon cans of Coleman camp fuel, matchboxes with the striker plates removed, bottles of Drano, a bottle of Heet, assorted coffee filters, and blister packs from cold medication. Appellant volunteered that he was burning his wife's methamphetamine lab because he was mad at her. Appellant was also heard to say that, if arrested, he would try to hang himself in jail and feign mental illness so that he would be found not guilty or only get probation. There was testimony that appellant's hands were stained with iodine.

In short order, other officers arrived at the residence, and a search warrant was subsequently obtained. In a kitchen cabinet, officers found a mason jar containing methamphetamine oil, coffee filters that had a white powdery substance on them, a Pyrex dish, paint thinner, an empty bottle of Heet, and a coffee grinder. A mason jar was found in the hallway that contained iodine and was

topped with a coffee filter that was stained with iodine. In the living room, they found camp fuel, an empty salt container, and Red Devil Lye.

In the master bedroom, the officers found a Kraft cheese box that contained .2809 grams of methamphetamine, coffee filters, and plastic corner bags. The closet in the master bedroom contained matchboxes with the striker plates removed, empty blister packs, a spatula, a Pyrex plate, tin foil, Heet bottles, hydrogen peroxide bottles, iodine, a box of syringes, freezer bags, alcohol swabs, packages of latex gloves, eight feet of tubing, and a bottle of brake fluid. On a night-stand, there was a mason jar that contained a bilayer solution. Another mason jar with saturated coffee filters was found on a filing cabinet. This cabinet contained yet another mason jar that had several Actifed pills inside. They also found a phone bill with appellant's name on it.

In the southwest bedroom, more Actifed cold pills were found. A coffee filter containing a white powder and a professional brand of drain opener were found in a closet. In the north bedroom, across the hall from the master bedroom, there were extensive iodine stains on the floor. It was said that it was not a normal amount of stain one would expect from just one "cook." There was a total of fifteen boxes of various brands of decongestant found in the house. Additionally, there was testimony relating the various items found to the process of manufacturing methamphetamine.

Kelly Dodson, appellant's wife, testified that she married appellant in February 2002, some four months prior to the search. She said that they lived at the residence, which had been her home prior to the marriage, but she stated that she had left several days before the search because appellant had been physically and emotionally abusive to her. She testified that between March and June 2002, appellant cooked methamphetamine an average of four or five times a week; that he sold it to others or traded methamphetamine for auto parts; that he had once traded methamphetamine for a Ford Probe; that she had accompanied him to purchase the ingredients for making methamphetamine; and that there were times when others would bring the ingredients for appellant to make methamphetamine in exchange for their getting some of the methamphetamine he produced. Ms. Dodson admitted that she had used methamphetamine and had been "strung out" for quite some time, but that she was now a recovering addict. In a plea bargain, she had pled guilty to attempt to manufacture metham-

phetamine, possession of drug paraphernalia, and possession of methamphetamine, for which she was placed on probation for six years.

Appellant contends that the evidence is not sufficient to sustain his conviction for possession of drug paraphernalia with intent to manufacture methamphetamine because the State did not produce the evidence necessary to show actual or constructive possession. We disagree.

▮▮▮▮ To convict one of possessing contraband, the State must show that the defendant exercised control or dominion over it. *Abshure v. State,* 79 Ark. App. 317, 87 S.W.2d 822 (2002). However, neither exclusive nor actual possession is necessary to sustain a charge of possessing contraband; rather, constructive possession is sufficient. *Id.* Constructive possession may be implied when the contraband is in the joint control of the accused and another; however, joint occupancy alone is insufficient to establish possession or joint possession. *Id.* The State must establish: (1) that the accused exercised care, control, and management over the contraband; and (2) that the accused knew the matter possessed was contraband. *Id.* Control and knowledge may be inferred from the circumstances where there are additional factors linking the accused to the contraband. *Id.* This control and knowledge can be inferred from the circumstances, such as proximity of the contraband to the accused; the fact that it is in plain view; and the ownership of the property where the contraband is found. *Id.*

▮▮▮▮ In this case, appellant admitted that he was burning what he, himself, described as a methamphetamine lab. Items associated with the production of methamphetamine were scattered throughout the house where appellant resided, some of it in plain view, and a large cache was found in the master bedroom. Appellant's hands were stained with iodine, an ingredient used in the manufacturing process, and there were obvious iodine stains on the floor in one of the bedrooms. Ms. Dodson testified that appellant manufactured methamphetamine on a regular basis and that he sold or traded the methamphetamine he produced. On this record, we cannot conclude that there is no substantial evidence to support the guilty verdict.

Appellant also contends that there is insufficient evidence to support his conviction for manufacturing methamphetamine because there was no HCL generator discovered in the search. There

was, however, a substance identified as methamphetamine oil found in the house. There was testimony that the production of methamphetamine oil was the second-to-last stage in the process of manufacturing methamphetamine and that the final stage involved the application of an HCL generator to methamphetamine oil in order to reduce the methamphetamine in the oil to a powder, its useable form. There was further testimony that tubing and the substances necessary to make an HCL generator were among the items discovered.

The term "manufacture" means the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis. Ark. Code Ann. § 6-64-101(m) (Repl. 1997). We have upheld methamphetamine-manufacturing convictions where not all of the ingredients necessary for the production of methamphetamine were present. In *Cherry v. State,* 80 Ark. App. 222, 95 S.W.3d 5 (2003), there was no lithium found, but we concluded that its absence was adequately explained by testimony that the substance was consumed during the manufacturing process. In *Aydelotte v. State,* 85 Ark. App. 67, 146 S.W.3d 392 (2004), anhydrous ammonia was not found, but we determined that there was sufficient evidence of manufacturing based on testimony that the manufacturing process had been completed and on evidence establishing that anhydrous ammonia had been used in the production process. Anhydrous ammonia was also missing in *Smith v. State,* 68 Ark. App. 106, 3 S.W.3d 712 (1999), yet we determined that the evidence was sufficient because the testimony showed that the manufacturing process had begun and that the appellant was expecting the delivery of the ammonia to complete the process. In the case at bar, although the manufacturing process was not finished, it had proceeded to all but the final stage, and the components necessary for completion had been assembled. We hold that there is substantial evidence to support appellant's conviction for manufacturing methamphetamine.

Appellant's final sufficiency argument concerns his conviction for possession of methamphetamine with intent to deliver. He contends that there is no evidence of the intent to deliver. Notwithstanding this argument, the methamphetamine that was discovered weighed .2809 grams, and there is a statutory

rebuttable presumption that one in possession of a stimulant drug weighing in excess of 200 milligrams possesses the contraband with the intent to deliver. Ark. Code Ann. § 5-64-401(d) (Supp. 2003). Given the presumption and the testimony that appellant produced methamphetamine for sale, we cannot say there is no substantial evidence to support the conviction.

Appellant's last point on appeal is that the trial court erred in denying his motion to suppress. This motion was made on the ground that the search was conducted at night although the warrant did not authorize a nighttime search. We find merit in this argument.

At the suppression hearing, it was disclosed that the officers first arrived at appellant's residence shortly after 7:00 p.m. After Officer Fitzhugh conducted a protective sweep of the house,[1] Detective John Dodd left at approximately 7:20 p.m. to obtain a warrant. The warrant was executed at 8:35 p.m.

The privacy of citizens in their homes, secure from nighttime intrusions, is a right of vast importance which is attested not only by our rules but also by our state and federal constitutions. *Garner v. State,* 307 Ark. 353, 820 S.W.2d 446 (1991); *Carpenter v. State,* 36 Ark. App. 211, 821 S.W.2d 51 (1991). Our rules of criminal procedure provide that a search conducted at night, which is set between the hours of 8:00 p.m. and 6:00 a.m., is permitted only if the issuing magistrate finds the existence of one of three exigent circumstances found in Rule 13.2(c).[2] Rule 13.2(c) also requires the search warrant to contain an appropriate order authorizing a nighttime search. *Hale v. State,* 61 Ark. App. 105, 968 S.W.2d 627 (1998); *Carpenter v. State, supra.* The search in this instance clearly violated the rule because it was conducted at night and the warrant contained no authorization for a nighttime search.

Even though the search violated Rule 13.2(c), our law provides that a motion to suppress should be granted only if the violation is considered "substantial." Ark. R. Crim. P. 16.2(e).

---

[1] Appellant did not challenge the legality of this search in his motion to suppress.

[2] Those circumstances are that the place to be searched is difficult of speedy access; that the objects to be seized are in danger of imminent removal; and that the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy.

Illegal nighttime searches are typically regarded as substantial violations. *See Richardson v. State,* 314 Ark. 512, 863 S.W.2d 572 (1993); *Garner v. State,* 307 Ark. 353, 820 S.W.2d 446 (1991); *State v. Martinez,* 306 Ark. 353, 811 S.W.2d 319 (1991); *Hall v. State,* 302 Ark. 341, 789 S.W.2d 456 (1990); *Zeiler v. State,* 46 Ark. App. 182, 878 S.W.2d 417 (1994); *Ramey v. State,* 42 Ark. App. 242, 857 S.W.2d 828 (1993). In *Brothers v. State,* 261 Ark. 64, 546 S.W.2d 715 (1977), however, the court found no material departure from the rule where the search began at "about 8 p.m." By contrast, in *State v. Martinez,* 306 Ark. 353, 811 S.W.2d 319 (1991), a search that began at 9:00 p.m. was considered a substantial violation. In this case, the warrant was executed at 8:35 p.m. This was well beyond the 8:00 p.m. deadline and is a lapse of time that cannot be regarded as negligible. We hold that the rule was substantially violated.

We must also consider whether the executing officers acted in good faith under *United States v. Leon,* 468 U.S. 897 (1987). *Richardson v. State, supra.* The test to be applied under *Leon* is an objective one, *Fouse v. State,* 337 Ark. 13, 989 S.W.2d 146 (1999), and the objective standard requires officers to have a reasonable knowledge of our rules. *Richardson v. State, supra.* The warrant did not authorize a search at night, and it appears that the officers did not even seek permission for a nighttime search. Yet, they executed the search after 8:00 p.m. We cannot say that the good-faith exception salvages this search. *See State v. Martinez, supra.*

Reversed and remanded.

GRIFFEN and BAKER, JJ., agree.